IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT C. TICE, | ) | CASE NO. 4:18-CV-1842 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Robert Tice ("Tice") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application for Supplemental

Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc.

16.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Tice filed an application for SSI in October 2011, alleging a disability onset date of

October 2011.[1] Tr. 182. He alleged disability based on the following: scoliosis, carpal tunnel,

bipolar disorder, ADHD, and intermittent explosive disorder. Tr. 214. After denials by the state

agency initially (Tr. 118) and on reconsideration (Tr. 140), Tice requested an administrative

hearing (Tr. 160). A hearing was held before an Administrative Law Judge ("ALJ") in 2013 and

the ALJ issued a decision determining that Tice was not disabled. Tr. 31, 7-23. The Appeals

Council denied Tice's request for review and Tice appealed to the federal district court, which

---

[1] Tice also filed an application in 2009, which was denied by an ALJ in July 2011. Tr. 86, 97.

remanded the case back to the agency in August 2016 for reconsideration of the treating physician opinion.  Tr. 1080.

Upon remand, Tice's case was assigned to a new ALJ and consolidated with a subsequent SSI application that Tice had filed.  Tr. 1077.  The ALJ held a hearing on March 6, 2017.  Tr. 876-915.  In his April 26, 2017, decision (Tr. 835-856), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Tice can perform, i.e., he is not disabled.  Tr. 855-856.  Tice requested review of the ALJ's decision by the Appeals Council (Tr. 827-831) and, on June 18, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 820-823.

## II. Evidence

### A. Personal and Vocational Evidence

Tice was born in 1981 and was 30 years old on the date he filed his application in 2011.  Tr. 854.  He has held over 60 short-lived jobs since 1997, including, most recently, as a fast food worker.  Tr. 881, 886.

### B. Relevant Medical Evidence

Tice started seeing psychiatrist Ronald Yendrek, D.O., from Valley Counseling Services, in June 2010.  Tr. 609-612.  Dr. Yendrek noted that Tice's mood was depressed and anxious and his attention and concentration were impaired.  Tr. 611.  Tice saw Dr. Yendrek until April 2012, during which time Dr. Yendrek prescribed and adjusted Tice's medications, including Strattera, Abilify, Saphris, Klonopin, Geodon, Wellbutrin, and Latuda.  Tr. 613-614.

Tice also saw professional counselor Lakeya Lee, PC, at Green Tree Counseling Center, between September 2010 and April 2011.  Tr. 725-726, 739.  In February 2011, Tice's "functioning" was described as "restless, fidgeting, loud speech, easily agitated."  Tr. 731.  In

March, his functioning was described as poor concentration and task completion.  Tr. 716.  In April, his functioning was described as loud, argumentative, and focused on irrelevant details.  Tr. 725.

In June 2011, Tice reported increased anxiety to Dr. Yendrek and shortly thereafter tried to cut his wrist.  Tr. 603-604, 600.  In November 2011, he reported "nonspecific" suicidal ideation.  Tr. 596.  He had lost his social security disability case, had enrolled in "ITT," and gotten a job at Taco Bell.  Tr. 596.

Tice saw licensed professional counselor Kris Carchedi, M.S.Ed., at Green Tree Counseling Center from July to November 2011.  Tr. 699-700, 711.  She regularly found him to be unkempt, angry/irritable, with poor judgment, and his functioning was described as poor anger control, poor coping skills, stressed, and feeling overwhelmed.  Tr. 711-721.

On December 27, 2011, Carchedi completed a daily activities questionnaire on behalf of Tice.  Tr. 467-468.  She wrote that Tice had reported having difficulty with former coworkers and frequent verbal arguments and reported being fired on several occasions for arguing and insubordination.  Tr. 467.  She wrote that Tice becomes easily frustrated with others; when asked follow-up questions regarding how often and for how long Tice visited with family and friends, Carchedi wrote, "unknown."  Tr. 467.  When asked for examples of anything that might prevent usual work activities, Carchedi listed back pain, low frustration tolerance, and "becomes stressed easily."  Tr. 467.  On December 29, Tice was discharged from treatment and Carchedi noted that his response to treatment was fair, he lacked insight and had poor judgment, and he had trouble taking recommendations.  Tr. 710.

On February 2, 2012, Tice saw qualified mental health specialist Gerald Pollock, M.S., from Homes For Kids mental health center and Pollock completed a daily activities

questionnaire on his behalf. Tr. 576-577. Pollock wrote that Tice gets along with family, friends and neighbors well and that he had been fired from past jobs for poor customer service and lack of anger control. Tr. 576. He wrote that Tice got along poorly with former coworkers and had poor anger management skills. Tr. 576. When asked to describe anything that might prevent usual work activities, Pollock listed back problems, low frustration tolerance, bipolar disorder, and anxiety. Tr. 576.

On February 6, 2012, Tice told Dr. Yendrek that he decided not to go to college after all and that PTSD was his primary problem. Tr. 592. He was not suicidal, he requested a medication change, and Dr. Yendrek assessed his response to treatment as fair. Tr. 592-593.

In June 2012, Tice returned to counseling with Lakeya Lee, this time at Homes for Kids. Tr. 819. His treatment plan was to increase his mood stabilization and increase his understanding of his symptoms. Tr. 819.

On July 9, 2012, Lee wrote a letter on Tice's behalf to the division of disability determination. Tr. 664. She wrote that Tice had treated at Homes for Kids since November 2011 and he had been diagnosed with bipolar disorder, NOS, and anxiety disorder, and she listed the following symptoms of these disorders: rapid alternation between manic and depressive symptoms, including depressed mood, insomnia or hypersomnia, agitation, fatigue, loss of energy, difficulty concentrating, frequent thoughts of suicide, grandiosity, decreased need for sleep, impulsive, risky behavior, rapid thoughts, excessive worry, restlessness, irritability, muscle tension, and difficulty falling or staying asleep. Tr. 664. Lee wrote, "All of these symptoms could make it difficult for client to engage in social situations, maintain concentration to complete tasks, control anger and frustration." Tr. 664.

On July 10, 2012, Lee completed a daily activity questionnaire on behalf of Tice. Tr.

665-666.  She reported that Tice had been easily frustrated when working in the past, was fired in the past for aggressive behavior, and, when asked to describe anything that might prevent Tice from work activities, wrote that he had a low tolerance for stress and frustration, was easily agitated, and had poor communication skills.  Tr. 665.

In April 2013, Tice saw Dr. Yendrek and reported chronic suicidal ideation, a stable mood, and "yells at son—chronic stress."  Tr. 803.  In June, Tice reported to Dr. Yendrek that he was doing well, had no mood issues, his main stress was problems with his son, and he vented about his neighbor.  Tr. 806.  Dr. Yendrek reported that Tice had a good response to treatment. Tr. 806.

In September and December 2013, Tice reported to Dr. Yendrek that his mood was "Ok" and vented about his neighbor, including, in September, that the neighbor "called cops on him twice–stupid stuff."  Tr. 1422, 1425.  Dr. Yendrek described Tice's response to treatment as good.  Tr. 1422, 1425.

In January 2015, Tice saw licensed professional counselor and clinical resident Queenie Merrell at Homes for Kids.  Tr. 1377.  Merrell noted that Tice was "continuing to have fits of rage, diff[iculty] controlling emotions, not being able to think when he gets angry."  Tr. 1377.

On June 2, 2015, Tice returned to Carchedi at Green Tree for counseling.  Tr. 1792, 1807. He reported feeling depressed, anxious, having OCD behavior, anger issues, mood swings, low self-esteem, feeling worthless and hopeless, being easily agitated, having poor sleep and issues with his neighbor, and having trouble dealing with his son's behaviors.  Tr. 1792.  Upon exam, his mood/affect was irritable, sad, depressed, and angry, and he had rapid speech, cooperative behavior, clean grooming, appropriate dress, a fair memory, poor insight and judgment, and logical thought content.  Tr. 1802-1803.  Carchedi rated his adjustment to disabilities as "poor."

Tr. 1805.

On June 13, 2015, counselor Merrell completed a Mental Status Questionnaire on behalf of Tice and for all questions referenced Tice's ISP (individualized service plans); there are three of record dated May 2013, October 2014, and April 2015. Tr. 1367-1376. In May 2013, Merrell wrote that Tice "continues to have angry outbursts and has difficulty verbalizing feelings other than being angry" and he had reported that he cannot recall thoughts when he becomes angry. Tr. 1374. His GAF was raised from 50 to a 53 due to a slight improvement in the number of his angry outbursts.[2] Tr. 1374.

In July 2015, Tice saw Carchedi and reported that he "almost went to jail" due to an incident with his neighbor; the neighbor was making comments and Tice's son was making comments back. Tr. 1811. The neighbor called the police and Tice was reprimanded. Tr. 1811.

On September 11, 2015, Tice had an initial evaluation with a staff member at Valley Counseling. Tr. 1763. He reported difficulty dealing with his son and an issue with his neighbor. Tr. 1763. He said that he has rage at times, loses his temper often, and occasionally thinks he hears his name being called. Tr. 1763. He stated that he is physically unable to work and reported that he smokes marijuana regularly, which worked better than any medication he has taken. Tr. 1763. The staff member told Tice, "we cannot prescribe controlled meds if he chooses to use marijuana." Tr. 1763. Upon exam, Tice's demeanor was demanding, his speech and thought content were normal, he reported auditory hallucinations, his thought process was racing and concrete, his mood was anxious with a constricted affect, he was impulsive and

---

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

cooperative, and his insight/judgment was rated "poor to fair." Tr. 1764-1766.

On September 16, 2015, Tice had a mental status assessment at Homes for Kids. Tr. 1818. He reported being easily frustrated and annoyed by others and having a hard time dealing with his teenaged son's constant disrespect, which, he stated, caused him panic attacks. Tr. 1818. He had a good relationship with his wife and a couple of positive friendships. Tr. 1818-1819.

On October 12, 2015, Carchedi from Green Tree Counseling completed a daily activities questionnaire on behalf of Tice. She noted that he had had weekly appointments since May 2015 but that she had not seen him since August 2015. Tr. 1785-1786. She commented that Tice reported conflicts with his neighbor and son. Tr. 1785. When asked to describe anything that might prevent usual work activities, Carchedi stated that Tice exhibits low frustration tolerance, is easily angered, and has reported chronic back pain. Tr. 1785.

On January 8 and February 4, 2016, Tice and his wife saw counselor Merrell. Tr. 2128, 2138. Tice's wife reported that, when Tice gets overly stressed, frustrated or angry, he threatens to harm himself. Tr. 2128, 2138. On February 16, Tice reported that he was feeling overwhelmed and irritated due to the harassment by his neighbor, his kids not listening, financial problems, and body pain. Tr. 2123. He reported being so highly irritated that he could not implement coping skills. Tr. 2123. He told Merrell that he "was feeling as though he was having a panic attack." Tr. 2123-2124.

On March 18, 2016, Tice returned to Merrell and she noted that he had a flat affect and displayed limited insight regarding his ability to manage his moods and symptoms when angry, evidenced by his reported inability to remember what he did after becoming angry. Tr. 2109-2010. On March 28, Tice was angry and agitated during his counseling session with a staff

member at Homes for Kids.  Tr. 2104.

In May 2016, Tice saw a nurse practitioner at Valley Counseling.  Tr. 1848.  He denied hallucinations.  Tr. 1848.  Upon exam, his mood was euthymic and irritable, he had a constricted affect, his speech and thought content were normal, and his insight and judgment were poor to fair.  Tr. 1848.

On July 29, 2016, Tice saw psychiatrist Ermias Seleshi, M.D., MPH,[3] at Coleman Behavioral Health.  Tr. 1859.  Tice reported using marijuana daily when it is available.  Tr. 1863. Upon exam, he was well groomed and thin, had an average demeanor and cooperative behavior, his mood was not overtly dysphoric, he had a full affect and a logical and circumstantial thought process, and he endorsed aggressiveness.  Tr. 1863-1864.  Dr. Seleshi diagnosed intermittent explosive disorder, episodic mood disorder, cannabis abuse, PTSD, ADHD, and borderline intellectual functioning and adjusted Tice's medications.  Tr. 1865-1866.

On November 4, 2016, Tice and his wife saw a professional counselor at Coleman.  Tr. 2247-2250.  Tice's wife reported that Tice had been "really, really mean" the day before and that he was very stressed due to finances.  Tr. 2247.  The counselor noted that the presence of Tice's wife was escalating Tice's anger and agitation and asked her to leave the session.  Tr. 2247.  Tice reported that he was stressed because he did not have money to buy marijuana; he is "calm and normal with it" but not without it.  Tr. 2247.  His pain management doctor had refused his request for marijuana and Percocet.  Tr. 2247.  Upon exam, he was well groomed, hostile, agitated, had an anxious, angry mood and a congruent affect, a tangential and racing thought process, and fair to poor insight and judgment.  Tr. 2247-2248.

On January 26, 2017, Tice saw Dr. Seleshi and stated that he had become more emotional

---

[3] MHP is a Master of Public Health degree.

and tearful.  Tr. 2251.  He reported some benefit with an increase in one of his medications.  Tr. 2251.  Upon exam, he had casual attire, adequate grooming, was cooperative, maintained steady eye contact, and was mildly anxious and dysphoric, but not irritable.  Tr. 2252.  There was no evidence of mania, psychosis, or abnormal psychomotor activity.  Tr. 2252.  He had clear speech, congruent affect, a logical, coherent, and goal directed thought process; no cognitive impairments in his ability to abstract, in his attention or concentration, or in his memory; and fair and appropriate insight and judgement.  Tr. 2252-2253.  Dr. Seleshi increased his medication.  Tr. 2255.  He wrote a letter for Tice's disability application and stated, "despite moderate improvement on a complex regimen of medications, [Tice] continues to struggle with significant residual symptoms and functional impairment.  As a result, he would not be capable of coping with the demands and stress of regular gainful employment presently or in the foreseeable future."  Tr. 2257.

### C. Medical Opinion Evidence

#### 1. Treating Source Dr. Yendrek's opinions

In February 2012, Dr. Yendrek completed a mental status questionnaire on behalf of Tice.  Tr. 578-580.  Dr. Yendrek opined that Tice had a fair ability to remember, understand, and follow directions; to maintain attention and sustain concentration, persist at tasks, and complete tasks in a timely fashion; and to adapt.  Tr. 579.  He would react poorly to work pressures and had issues with social interaction.  Tr. 579.

In March 2012, Dr. Yendrek completed a medical source statement and opined that Tice had mild restrictions in activities of daily living and maintaining social functioning.  Tr. 582.  He could remember, understand, and follow directions for simple tasks at least 85% of the time, could stay on task less than 66% of the time, would be 15-25% less productive than an

unimpaired worker, and would be absent, late, or leave early more than 15% of the time.  Tr. 583-584.  He could successfully engage in occasional, superficial social interactions but would be occasionally distracted by coworkers.  Tr. 584.  He could not accept criticism and supervision except in a supportive work environment; he would be likely to have emotional blowups or outbursts on average more than once every other month; and his symptoms would be exacerbated by a fast-paced job, a job with deadlines, or a job requiring precision.  Tr. 584-585.  He was emotionally fragile and even routine or unskilled/low-skilled work with rare changes would likely cause him to decompensate; therefore, he was only likely to be successful in a sheltered environment.  Tr. 585.  The first page of the form included a special note to "not include limitations which would go away if this individual stopped using drugs or alcohol."  Tr. 582.

### 2. Consultative Examiner Dr. Haaga's opinions

On December 30, 2016, Tice saw Jennifer Haaga, Psy.D., for a consultative examination.  Tr. 2042-2050.  Upon exam, he was dressed appropriately and was disheveled, cooperative with good eye contact, had normal speech but was hypertalkative, and had a logical, organized, coherent, and tangential thought process.  Tr. 2046.  His mood and affect were somewhat down and he displayed no motor manifestations of anxiety.  Tr. 2046.  He did not appear to be responding to internal stimuli but he had delusional content in his spontaneous speech.  Tr. 2047.  He needed reminders of what he was asked and demonstrated some difficulties with recent memory functioning during the evaluation.  Tr. 2047.  He "appear[ed] to have adequate common sense reasoning and judgment."  Tr. 2047.  Dr. Haaga diagnosed trauma and stressor related disorder, some symptoms of PTSD; intermittent explosive disorder; unspecified bipolar and related disorder; borderline intellectual functioning; cannabis use disorder, mild, in early remission; and ADHD, combined presentation.  Tr. 2048.  She noted no inconsistencies in his

report and remarked that his reported symptoms were consistent with his presentation.  Tr. 2048.  She opined that Tice was capable of comprehending and completing simple routine tasks consistent with his estimated level of cognitive functioning but would have difficulties with understanding, remembering, and following instructions when tasks became complex; he would have some difficulty with attention and concentration when demands became too great; and remarked that he reported difficulties getting along with others.  Tr. 2049-2050.

On January 9, 2017, Dr. Haaga completed a medical source statement on behalf of Tice and opined that Tice had no difficulty understanding, remembering and carrying out simple instructions; moderate limitations in his "ability to make judgements on simple work-related decisions"; and marked limitations in his ability to interact with the public, supervisors, and coworkers, and responding appropriately to usual work situations and changes in a routine work setting.  Tr. 2051-2052.  She explained, "Mr. Tice reported that his primary difficulties with work and other situations have been due to managing anger and handling conflict.  He reported becoming easily frustrated and angered."  Tr. 2052.  When asked whether alcohol or drug use contributed to the assessed limitations, Dr. Haaga responded that Tice's records indicate his belief that marijuana would be helpful in managing his symptoms and he likely relied on marijuana in the past to manage symptoms.  Tr. 2052.

### 3. State Agency Reviewers' opinions

In February 2012, state agency reviewing psychologist Joseph Edwards, Ph.D., adopted the ALJ's residual functional capacity ("RFC") findings from the July 2011 decision: Tice could perform one-to-two-step tasks in a static environment with a low production pace, have superficial contact with coworkers and supervisors, and only have brief and superficial contact with the public.  Tr. 114.  In July 2012, state agency reviewer Sara Long, M.D., affirmed Dr.

Edwards' opinion.  Tr. 134.

In July 2015, state agency reviewing psychologist Courtney Zeune, Psy.D., opined that Tice could perform simple tasks in a setting without demands for sustained rapid pace or meeting strict production quotas; could have superficial social interactions in a less public setting; and could adapt to a routine work setting.  Tr. 1030-1031.  In November 2015, state agency reviewer Paul Morton, M.D., adopted the ALJ's RFC finding from December 2013: Tice can perform one-to-two-step tasks, have superficial contact with coworkers and supervisors and no interaction with the public, and can perform work with no production rate pace (e.g. assembly line work) but can perform goal-oriented work (e.g. office cleaner).  Tr. 1047.

### D. Testimonial Evidence

#### 1. Tice's Testimony

Tice was represented by counsel and testified at the administrative hearing.  Tr. 880.  He testified that he lives with his wife and three children.  Tr. 881.  He is able to drive and drove himself to the hearing; his wife accompanied him.  Tr. 882.  Sometimes he gets panic attacks when he drives when it gets really congested and people are "flying beside me."  Tr. 882.  It happened this morning as he was driving to the hearing and also two days prior when he was driving to the store.  Tr. 882.  When this happens his body "just starts feeling real weird….my head fogs up and then I start freaking out."  Tr. 883.  He also sometimes gets angry when he drives.  Tr. 903.

Although Tice has worked many jobs in the past, the jobs did not last long.  Tr. 887-885.  Most jobs lasted maybe a month.  Tr. 887.  He is surprised he did not get fired from a couple of jobs because he blacked out at work and bosses have told him that he has done things he doesn't remember doing.  Tr. 887-888.  He is not sure if he got fired from these former jobs because

some of them were so long ago; some he quit because the stress of the job or his physical condition got in the way at times and he was not able to perform the way he needed to. Tr. 888. He explained that, when he gets stressed, he doesn't know how to control himself, even with prescribed medication. Tr. 888. It makes it hard for him to cope and think about what he should be doing and then his mind isn't thinking right and stuff happens. Tr. 888-889. For example, he blacked out at work several times and "one manager told me I bounced my head off the bun rack ten times." Tr. 889. He guesses that he just blacked out "and just like started going ballistic in there." Tr. 889. He does not have a recollection of what happens when he blacks out. Tr. 889. Another boss told him that he was in the back area at work punching boxes when he was mad and he almost got fired, but the boss did not fire him because she knew he needed the money. Tr. 889. Tice's last job was in 2011 at Taco Bell, where he was handing orders out the drive-thru window. Tr. 891. He could no longer do this job because it hurt his back. Tr. 891.

Tice stated that his blackout periods still occur. Tr. 889. The last major one was the previous summer; his sister called the police and they were looking for him because he had disappeared. Tr. 889. He was down by the river two miles from his home but he did not know how he got there. Tr. 889-890. Smaller blackout periods happen more frequently, about two to three times a month. Tr. 890. When he has a smaller one, if he can quickly get away from the situation that is causing his feelings it is better for him. Tr. 890. He will take a small walk down to the bike trail and take a breather from the situation. Tr. 890. That is what the counselors have told him to do. Tr. 890. Or he gets in his car and goes fishing, which is also good therapy for him. Tr. 890.

Tice takes the following medications: Lamictal, Wellbutrin, and Remeron. Tr. 896. He thinks there are two others but he can't remember what they are. Tr. 896. He has no side effects

but "they don't always seem like they work as well." Tr. 896. He also experiences depression. Tr. 896. Suicidal thoughts run through his head frequently, at least three to four times a month. Tr. 896. Sometimes, two days a week, he just wants to lie around all day and do nothing. Tr. 897. He tries to get out and go on a walk when he feels this way. Tr. 897. Other than walking and fishing, he spends time with his family, goes to a store, and maybe takes the kids to the zoo. Tr. 898.

Currently, Tice is going to Coleman Behavioral Health for counseling and sees Dr. Seleshi every three months and "Andrew" every month. Tr. 898. When asked if he thinks things are getting better or worse with his treatment, Tice stated, "Andrew's helping out and I think Dr. Seleshi is doing what he can too at this time." Tr. 899. He has been able to get his symptoms a little bit better controlled at times with their help. Tr. 899. He is opening up about a lot of things that have happened in the past. Tr. 899.

Tice testified that he usually does the cooking at home and sometimes he'll turn the laundry on after the kids have set it up. Tr. 899. He'll fold clothes once in a while. Tr. 899. He mows the lawn with a push mower; the lawn is only a half an acre and it takes a while. Tr. 899. He is on Facebook a little bit. Tr. 899. He has smoked marijuana in the past, every day, up until six months prior to the hearing. Tr. 900. He smoked due to his physical conditions and because it also seemed to help with his mental issues as well. Tr. 900. He confirmed that he has a lot of conflicts with his son and he does not get along well with a neighbor. Tr. 900. When asked if these relationships are the exception or the norm and whether he doesn't get along with people well, Tice answered that he usually doesn't have issues with anybody else "unless they agitate me." Tr. 900. If they frustrate him or say something, it makes him angry. Tr. 901. He is not easy to agitate, however; "it takes quite a bit to push me over my limit." Tr. 901.

Tice has a hard time falling and staying asleep at night. Tr. 901. There are times when he has been up all night because his brain won't shut down even with the medication they give him. Tr. 901. His brain just keeps going and he starts contemplating things that are happening or going to happen or he starts freaking out and thinking about where he is in life and when he's going to die. Tr. 901. And if he goes to a store and sees a bunch of cars his body instantly starts feeling weird and numb. Tr. 901. His head starts feeling foggy and when he gets inside the store and it's really crowded, that makes it worse; he starts having a hard time breathing and his chest starts getting tight. Tr. 901.

About two or three times a week Tice has an episode of anger where he does not feel like he is in control of himself. Tr. 901-902. What provokes these episodes could be when he is doing or looking at something and his kids could say the wrong thing and he will yell at them and start screaming. Tr. 902. If someone comes up behind him and he is not expecting it and they startle him, he starts feeling really weird and freaky and he gets angry and yells at them. Tr. 902. When this happens it takes one to four hours to calm down. Tr. 902. Once, he and his wife were at Coleman for counseling and he got irritated and his counselor suggested that his wife leave. Tr. 902. He thinks at the time he and she were having an issue. Tr. 902. He is also very emotional and will start crying over something simple. Tr. 903. This happens sometimes two to three times a week and he does not know why. Tr. 903. He has difficulty concentrating and staying focused on what he's supposed to be focused on. Tr. 904. He used to be able to make dinner faster but now it takes five or six hours. Tr. 904.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing. Tr. 905-914. The ALJ discussed with the VE Tice's past work as a fast food worker and asked the VE to determine

whether a hypothetical individual of Tice's age, education and work experience could perform his past work or any other work if that person had the limitations assessed in the ALJ's RFC determination. Tr. 905-907. The VE answered that such an individual could not perform Tice's past work but could perform other jobs with significant numbers in the national economy such as inspector and hand packager, electronics worker, and assembler of printed products. Tr. 907.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his April 26, 2017, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since October 12, 2011, the application date. Tr. 837.

2. The claimant has the following severe impairments: intermittent explosive disorder, mood disorder, cannabis abuse, posttraumatic stress disorder, attention deficit hyperactivity disorder, borderline intellectual functioning, neurofibromatosis, lumbar degenerative disc disease, osteoarthritis, gastroesophageal reflux disease, gastritis, degenerative joint disease of the knees, and a right wrist neuroma. Tr. 837.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 837.

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except he can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 404.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

crawl.  He should avoid concentrated exposure to temperature extremes and hazards
such as unprotected heights.  He is limited to unskilled work consisting of simple routine
repetitive tasks performed in a static environment that would experience few if any work
related changes, and those changes that might occur would be gradually introduced,
explained, and/or demonstrated.  He is limited to no strict time or strict high production
quotas.  Work is incidental to no contact or interaction with the general public and
frequent superficial interaction with coworkers and supervisors, with superficial
meaning no sales, arbitration, conflict resolution, direction, management or group tasks.
Tr. 840.

5.  The claimant is unable to perform any past relevant work.  Tr. 854.

6.  The claimant was born in 1981 and was 30 years old, which is defined as a younger
individual age 18-49, on the date the application was filed.  Tr. 854.

7.  The claimant has at least a high school education and is able to communicate in English.
Tr. 854.

8.  Transferability of job skills is not an issue in this case because the claimant's past work
is unskilled.  Tr. 854

9.  Considering the claimant's age, education, work experience, and residual functional
capacity, there are jobs that exist in significant numbers in the national economy that the
claimant can perform.  Tr. 854.

10. The claimant has not been under a disability, as defined in the Social Security Act, since
October 12, 2011, the date the application was filed.  Tr. 855.

## V. Plaintiff's Arguments

Tice challenges the ALJ's decision on two grounds: the ALJ failed to follow the treating

physician rule when he evaluated Dr. Yendrek's opinion; and the ALJ erred when he evaluated

the opinion of consultative examiner Dr. Haaga.  Doc. 18, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ did not err when he evaluated Dr. Yendrek's opinions

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Tice argues that the ALJ erred because he failed to follow the applicable regulations for

evaluating Dr. Yendrek's opinions. Doc. 18, p. 15; Doc. 22, p. 2.[5] He asserts that the ALJ

"failed to provide the required 'good reasons'" for assigning Dr. Yendrek's opinions "little"

weight. Doc. 18, p. 17. The Court disagrees.

Tice first challenges the ALJ determination that the record does not support Dr.

Yendrek's opinion that he would have emotional blowups or outbursts on average more than

once every other month. Doc. 18, p. 17. The ALJ explained,

> While the record shows reported mood changes, anger, and irritability (C32/15)…, the degree of limitations alleged with regard to emotional blowups or outbursts are not supported by the record. Indeed, the claimant testified at the hearing that he did not become agitated ea[sily]. While on redirect, he stated that he was agitated at times, his testimony indicated some tolerance related to outbursts. Further, the record was limited to two individuals with whom the claimant had ongoing issues, his neighbor and his son. Otherwise, the record lacks evidence or discussion of ongoing disputes with strangers, family members, or coworkers in the past.

Tr. 848. Tice objects to the ALJ's finding, arguing that the record documents that Tice's anger

problems were not limited to two people. Tr. 18, p. 17. In support, he submits that records from

counselor Carchedi show that he had poor anger control, poor judgment, and an angry, irritable

affect, and that a chiropractor "noted that he was 'easily agitated.'" Doc. 18, p. 17. First, the

chiropractor's note only states, "Bipolar + easily agitated"; it does not follow that the

chiropractor found Tice to have bipolar disorder and observed him to be easily agitated, as

opposed to writing what Tice himself reported. Moreover, this evidence cited by Tice does not

negate the ALJ's accurate observation that the record does not detail evidence of ongoing issues

with people other than Tice's neighbor and son. Subsequent treatment notes relied on by Tice

(Doc. 18, p. 18) also fail to show that Tice had ongoing issues with people other than his

neighbor and son; in fact, three of the four cited records are visits in which Tice continued to

---

[5] Although Tice asserts that he challenges the ALJ's evaluation of Dr. Yendrek's opinions based on whether the ALJ applied the factors in the regulations (e.g., Doc. 22, pp. 1-2), he also challenges the evidence the ALJ relied upon (e.g., Doc. 18, pp. 17-20).

report issues with his neighbor and son.  Tr. 1802, 1805 (issues with neighbor, son); 1738-1740

(issue with son); 1377-1378 (neighbor).

Tice also challenges the ALJ's evaluation of Dr. Yendrek's opinion regarding his ability

to concentrate and deal with work stress.  Regarding these limitations, the ALJ explained,

> Turning to the opinion regarding being off task 33% of the workday or being absent, late or early leaving work 15% of the time, the mental status examination findings did not suggest limitations in concentration, persistence, or pace consistent with such a significant limitation.  While he presented at times with racing thoughts (C59F/37), the record lacked evidence of notable issues with memory, concentration or persistence.  This was eviden[t] in the lack of such findings beyond subjective complaints made during treatments….Finally, while the claimant's mental health treatment notes indicate some serious limitation, the opinion that the claimant would decompensat[e] with small changes in work stress or changes in environment, making a sheltered environment a necessity is not supported by the record, which did not indicate one instance of decompensation despite obvious stressors such as the claimant's son and neighbor (C52F/7).

Tr. 848.  Tice argues that poor concentration was noted in exam findings contemporaneous to Dr.

Yendrek's opinion.  Doc. 18, p. 17 (citing Tr. 559, 725, 726, 727).  But the ALJ's explanation

states that the record lacked "notable" issues with memory, not any issues with memory; this

explanation is accurate and suffices to explain why he discredited Dr. Yendrek's opinion that

Tice would be off task 33% of the workday.  Regarding Tice's ability to deal with work stress,

Tice concedes that he has had no episodes of "extended decompensation," but submits, "the

record contains numerous examples in which his reaction to everyday events results in anger that

is not adequately compensated, i.e., he experiences a deterioration in functioning."  Doc. 18, p.

19.  But, again, the "everyday events" were primarily in response to issues Tice had with his

neighbor and son, which the ALJ acknowledged, and which do not go to the issue of Tice's

ability to handle work stress.  Moreover, the ALJ accounted for Tice's issues with concentration

and ability to handle work stress when he limited Tice to performing unskilled work consisting

of simple, routine, repetitive tasks in a static environment with few if any work-related changes,

changes that would occur would be gradually introduced, explained, and/or demonstrated, and his work would have no strict time or high production quotas.  Tr. 840.

Tice complains that the ALJ referenced Tice's daily activities without citing them.  Doc. 18, p. 19.  The ALJ, in his explanation of why he found that Dr. Yendrek overstated Tice's psychologically related symptoms and limitations, wrote, "Moreover, claimant's activities of daily living as discussed above remain primarily intact.  This further suggests that the claimant is not as limited as Dr. Yendrek's opinions suggest."  Tr. 848.  Previously in his decision (i.e., "discussed above"), the ALJ noted Tice's activities of daily living: cook simple meals, perform personal care and household chores, shop in stores, and take care of finances.  Tr. 839.  Dr. Yendrek himself opined that Tice only had a mild limitation in his activities of daily living, as the ALJ noted.  Tr. 847.  The ALJ did not err when he stated that Tice's intact ability to perform activities of daily living undermined the severe limitations that Dr. Yendrek assessed regarding Tice's ability to handle work stress and his opinion that Tice needed a sheltered environment to be successful.

Tice submits that the ALJ failed to consider all of the required factors, e.g., failing to mention that Dr. Yendrek began treating Tice in 2010.  Doc. 18, p. 19-20.  The ALJ's failure to mention that Dr. Yendrek began treating Tice in 2010 does not mean that the ALJ did not consider Tice's treatment history with Dr. Yendrek.  *See Francis v. Comm'r of Soc. Sec*., 414 F. App'x 802, 804 (6th Cir. 2011) (rejecting the claimant's argument that the ALJ erred when neglecting two factors (the length and nature of the treating relationship) and stating, "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis.").  Tice's reliance upon *Hensley v. Astrue*

is misplaced; in *Hensley*, the Sixth Circuit remanded the case because the ALJ only gave one insufficient reason for discounting a treating physician opinion. 573 F.3d 263, 266-267 (6th Cir. 2009). Here, the ALJ gave multiple reasons for why he found Dr. Yendrek's opinions inconsistent with and unsupported by the substantial evidence of record. Whether an opinion is consistent with or supported by the record are "good reasons." 20 C.F.R. § 416.927(c)(2) (In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.). In any event, the ALJ also recognized that Dr. Yendrek, a D.O., treated Tice for mental health problems regularly, prescribed him medications, and that Tice discussed his problems in his visits with Dr. Yendrek. Tr. 842, 843, 847. In other words, the ALJ mentioned and considered the length of treatment, nature of treatment, and specialization of the physician. 20 C.F.R. § 416.927(c)(2).

Tice argues that substantial evidence supports Dr. Yendrek's findings, and cites the opinions of counselors Carchedi, Pollock, and Lee, and psychiatrist Seleshi. Doc. 18, p. 20. But the ALJ discounted these opinions, findings that Tice does not challenge. Furthermore, the standard is whether substantial evidence supports the ALJ's decision, not whether there is other evidence in the record that might support a different finding. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion, even when substantial evidence may support the claimant's position).

Finally, Tice contends that the ALJ discounted Dr. Yendrek's opinion for not discussing Tice's ongoing use of marijuana but points out that the form Dr. Yendrek filled out specifically directed, "do not include limitations which would go away if the individual stopped using drugs

or alcohol." Doc. 18, p. 18; Tr. 582. The ALJ's comment—that Dr. Yendrek "never discusses" Tice's ongoing marijuana use—is accurate. The form raised the issue of drug use, Tice regularly (often daily) used marijuana, and Dr. Yendrek did not mention Tice's use of marijuana or provide any comments, despite multiple portions of the form inviting comment. Tice complains that the ALJ "engages in medical speculation" that Tice's use of marijuana was an exacerbating factor in his mood symptoms. Defendant concedes that this was error but asserts that the error is harmless because the ALJ gave enough "good reasons" for discounting Dr. Yendrek's opinion. Doc. 21, p. 11. The Court agrees; the ALJ's comment about marijuana use aside, the ALJ gave "good reasons" for discounting Dr. Yendrek's opinions.

In sum, the ALJ did not err with respect to Dr. Yendrek's opinions.

**B. The ALJ did not err when he evaluated Dr. Haaga's opinions**

Tice argues that the ALJ erred when he evaluated consultative examiner Dr. Haaga's opinions. Doc. 18, p. 22. The ALJ detailed Dr. Haaga's opinions and explained,

> The opinion of Dr. Haaga is given some weight because she is an acceptable medical source who examined the claimant. However, she offered vague opinions in her narrative with statements such as "some difficulty". These provide limited probative value into the vocationally relevant limitations the claimant[] experiences. Looking to the evaluation statement, her finding of marked limitations in interaction and responding to changes in situations and work setting are given little weight. While the claimant often presented with irritability and reported ongoing anger issues, the record lacks evidence to suggest that he was incapable of interacting with others in a work setting. Indeed, the claimant testified at the hearing that he was not easily agitated. While he later testified that he could be agitated up to three times each week, his treatment notes suggested stressors were his neighbor and son. He noted positive relationships with friends and his wife. Further, the record lacks evidence to suggest he would be unable to respond appropriately to changes in situations and work setting.

Tr. 852. Tice submits that his anger and irritability are pervasive in the record and not limited to interactions with his neighbor and son. Doc. 18, p. 24. However, he does not identify record evidence showing that he had anger and irritability as a result of issues with people other than his

neighbor and son.  Thus, the ALJ's finding that the record lacks evidence to suggest that he was incapable of interacting with others in a work setting is accurate.  In support of his assertion that record evidence supports Dr. Haaga's opinion that he would be unable to respond appropriately to changes in situations and work setting, Tice cites the opinions of Dr. Yendrek, Dr. Seleshi, and counselors Carchedi, Pollock, and Lee.  Doc. 18, p. 24.  But the ALJ discounted those opinions; his evaluation of Dr. Yendrek is not erroneous; and Tice did not challenge his evaluations of the other opinion evidence.  The ALJ did not err with respect to Dr. Haaga's opinions.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.


Dated: October 23, 2019

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge